UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                            Case No. 2:10-cr-28
                                            HON. R. ALLAN EDGAR

BRIAN SCOTT FISHER,

       Defendant.

_____/

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                            Case No. 2:10-cr-32
                                            HON. R. ALLAN EDGAR

ASHLEY ROSE WALKER,

       Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Brian Scott Fisher was indicted on July 20, 2010, and charged with possession with intent to distribute cocaine.  Ashley Rose Walker was indicted on August 24, 2010, and charged with possession with intent to distribute crack cocaine and marijuana.  During the investigation of both defendants, GPS tracking units were used to monitor their locations.  Both defendants filed motions to suppress, which were unsuccessful.  Thereafter, defendants entered into conditional plea agreements, reserving the right to challenge the Court's ruling on their motions to suppress. While those appeals were pending in the United States Court of Appeals for the Sixth Circuit, the United States Supreme Court issued its decision in *United States v. Jones*, 132 S.Ct. 945 (2012). Thereafter,

the two cases were remanded to this Court.  The two cases present similar legal questions on remand and the parties requested that the cases be consolidated.  By order dated November 2, 2012, these cases were consolidated.

## Background

In May of 2010, officers with the Upper Peninsula Substance Enforcement Team (UPSET) received information from a confidential informant that defendant Fisher, along with his girlfriend and Patrick Wayne, were obtaining cocaine from sources in Lansing, Michigan, and Chicago, Illinois.  UPSET officers received information that on May 28, 2010, defendant Fisher was planning to drive a white four-door Oldsmobile to Lansing, Michigan, to obtain cocaine and return to Escanaba, Michigan, the next day.  Thereafter, UPSET officers placed a GPS unit on the bumper of defendant Fisher's vehicle, and also conducted physical surveillance of defendant, which confirmed that defendant traveled to Lansing, Michigan, and back to Escanaba, Michigan.  The battery pack on the GPS unit was changed on June 4, 2010.  In June of 2010, the confidential informant told UPSET officers that defendant was planning a trip to Chicago, Illinois, to obtain cocaine.  UPSET officers utilized physical surveillance and the GPS unit to track defendant's travel and confirmed that defendant made the trip to Chicago.  Law enforcement officers observed defendant's vehicle leave Escanaba and head towards Chicago on June 11, 2010.  The officers followed defendant until he arrived in Chicago, and relied upon the GPS device to maintain surveillance of defendant in the Chicago area.  The GPS unit was utilized to alert officers when defendant left the Chicago area and allowed UPSET officers to position themselves on U.S. Highway 41 to intercept the vehicle.  The vehicle was stopped in Michigan and a dog trained in narcotics was utilized in the search of the vehicle.  The search of the vehicle revealed three ounces of cocaine.  No warrants were obtained to search the vehicle or to install the GPS unit.

UPSET officers first learned about defendant Walker in July of 2009 when they received tips from alleged coconspirators.  Thereafter, UPSET officers made four controlled buys of crack cocaine from defendant Walker.  One buy occurred in October 2009, another buy in January 2010, and two buys occurred in February 2010.  After the first controlled buy in October 2009, UPSET officers placed a GPS tracking unit on defendant Walker's vehicle.  The GPS tracking unit was placed on defendant's vehicle on four separate occasions in November 2009, December 2009, March 2010, and July 2010.  UPSET officers also relied upon visual surveillance of defendant Walker.  During the course of their investigation, UPSET officers received eight to ten tips that defendant Walker was trafficking in cocaine.  During all four installations, the GPS unit revealed that the vehicle had traveled to Chicago.  The information UPSET officers had was that defendant was believed to be purchasing cocaine in Chicago.  In July of 2010, law enforcement officers monitored the GPS unit and determined that defendant had made a trip to Chicago.  Prior to defendant's return from Chicago, law enforcement officers obtained state search warrants to search her vehicle and her apartment.  These warrants were based, in part, upon the information learned from the GPS unit.  Upon defendant's return from Chicago in July 2010, her vehicle was searched and two ounces of cocaine and a half pound of marijuana were discovered.  A search of defendant's apartment revealed scales, packaging material, and other drug trafficking evidence.  Defendant Walker was advised of her *Miranda* rights and, thereafter, made a statement admitting to her involvement in drug trafficking.

## **Issues Presented**

The parties have agreed that the following issues are presented for consideration following the Sixth Circuit's remand in this matter:

1.      Whether *Jones* necessitates the granting of Defendant-Appellant's original motion to suppress evidence;

2.      Whether law enforcement officers had an objectively reasonable basis for believing that their attachment of a GPS transmitter to the Defendant-Appellant's vehicle was authorized under then-existing precedent and, if so, whether the good-faith exception to the exclusionary rule applies; and

3.      Whether the evidence at issue would inevitably have been discovered despite the use of the GPS.

In the opinion of the undersigned, if the UPSET officers had an objectively reasonable basis for believing that attachment of the GPS unit was permissible under the Fourth Amendment, then the good faith exception should be applied and the exclusionary rule is inapplicable.

In *Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357 (1998), the Supreme Court explained:

> We have emphasized repeatedly that the governments' use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution.  Rather, a Fourth Amendment violation is "'fully accomplished'" by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can "'cure the invasion of the defendant's rights which he has already suffered.'"   The exclusionary rule is instead a judicially created means of deterring illegal searches and seizures. As such, the rule does not "proscribe the introduction of illegally seized evidence in all proceedings or against all persons," but applies only in contexts "where its remedial objectives are thought most efficaciously served," Moreover, because the rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its "substantial social costs."

*Id.* at 362-363 (citations omitted).

In *Herring v. United States*, 555 U.S. 135 (2009), the Supreme Court explained:

> The fact that a Fourth Amendment violation occurred – i.e., that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies.  Indeed, exclusion "has always been our last resort, not our first impulse," and our precedents establish

important principles that constrain application of the exclusionary rule.

First, the exclusionary rule is not an individual right and applies only where it "'result[s] in appreciable deterrence.'" We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future.

In addition, the benefits of deterrence must outweigh the costs. "We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs."

* * *

Indeed, the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional. In *Weeks*, a foundational exclusionary rule case, the officers had broken into the defendant's home (using a key shown to them by a neighbor), confiscated incriminating papers, then returned again with a U.S. Marshal to confiscate even more. Not only did they have no search warrant, which the Court held was required, but they could not have gotten one had they tried. They were so lacking in sworn and particularized information that "not even an order of court would have justified such procedure."

* * *

Equally flagrant conduct was at issue in *Mapp v. Ohio*. Officers forced open a door to Ms. Mapp's house, kept her lawyer from entering, brandished what the court concluded was a false warrant, then forced her into handcuffs and canvassed the house for obscenity.

* * *

To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some

circumstances recurring or systemic negligence. The error in this case
does not rise to that level.

*Id.* at 143-144 (citations omitted).

Both parties rely on the Supreme Court's decision in *Davis v. United States*, 131 S.Ct.
2419 (2011), in support of their respective positions.  The Supreme Court explained in *Davis* that
the exclusionary rule should not be applied if police acted in good faith.  The government in this case
maintains that for the exclusionary rule to apply, the conduct of the police officers must have been
deliberate, reckless, or grossly negligent.  There is support for this position in *Davis*:

> The basic insight of the Leon line of cases is that the deterrence
> benefits of exclusion "var[y] with the culpability of the law
> enforcement conduct" at issue.  When the police exhibit "deliberate,"
> "reckless," or "grossly negligent" disregard for Fourth Amendment
> rights, the deterrent value of exclusion is strong and tends to
> outweigh the resulting costs.  But when the police act with an
> objectively "reasonable good-faith belief" that their conduct is lawful
> or when their conduct involves only simple, "isolated" negligence, the
> "'deterrence rationale loses much of its force,'" and exclusion cannot
> "pay its way."

*Id.* at 2423 (citations omitted).

Defendants rely upon a law review note as establishing that the law regarding the
need for a warrant to install a GPS unit was less than clear at the time of the installation of the GPS
units in the present cases.  That note, however, does not support defendants' argument.  The note
suggests that the law at that time supported a finding that use of GPS technology was not a search.
The author was arguing for a change in the law.  Defendants also argue that state cases requiring a
warrant should have been relied upon by UPSET officers in this case.  The note explained:

> In perhaps the most prominent case addressing GPS tracking, the
> Washington Supreme Court held in 2003 in *State v. Jackson* that the
> monitoring of a GPS tracking device constitutes a search requiring a
> warrant under the Washington State Constitution. In Jackson, police
> obtained warrants to impound and search two vehicles belonging to

the defendant, who was suspected of murdering his daughter. While the vehicles were impounded, police installed GPS tracking devices; officers then returned the vehicles to the defendant without informing him the tracking devices had been installed. By downloading data from the GPS devices through the Internet, police learned of the defendant's movements to a location where he had dumped the child's body.

Acknowledging that the Washington version of the Fourth Amendment is broader in scope than the federal Fourth Amendment, the Washington court held that GPS tracking required a warrant under the state constitution. The court reasoned that GPS was a "particularly intrusive method of surveillance" because it did not merely augment the senses; rather, it served as a total substitute for visual tracking and therefore was distinguishable from other sense-augmenting devices like binoculars. Also pointing out that police obtained GPS data over the course of two and one-half weeks, the court stated it was unlikely police could have continued such constant twenty-four-hour visual surveillance throughout that period. In this vein, the court explicitly rejected the notion that GPS tracking equated to following the defendant as he traveled on public roads.

April A. Otterberg, Note, *GPS Tracking Technology: the Case for Revisiting Knotts and Shifting the Supreme Court's Theory of the Public Space Under the Fourth Amendment*, 46 B.C. L. Rev. 661, May 2005.

In my opinion, UPSET officers should not be required to look to state court decisions in other states interpreting a state constitution for guidance on the Fourth Amendment.

Defendants rely on a subsequent portion of *Davis*, maintaining that the *Leon* good faith exception applies only if police officers are relying on binding circuit court judicial precedent which support their actions. This position finds some support in *Davis*:

The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent. At the time of the search at issue here, we had not yet decided *Arizona v. Gant* and the Eleventh Circuit had interpreted our decision in *New York v. Belton* to establish a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. The search incident to Davis's arrest in this case followed the Eleventh Circuit's *Gonzalez* precedent to the letter. Although the search turned out to be

> unconstitutional under *Gant*, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way.
>
> Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis's claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu [l]" deterrence, and culpable enough to be "worth the price paid by the justice system." The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

*Id.* at 2428 (citations omitted).

Several courts have accepted the position asserted by the defendants in this case, that the *Leon* good faith exception to the exclusionary rule only applies if the police officers who are later found to have violated the Fourth Amendment, were relying on binding circuit precedent. *See United States v. Robinson*, 2012 WL 4893643 (E.D. Mo. (Oct. 15, 2012), pp. 10-13, for a comprehensive analysis of recent cases on the subject.

I have been unable to find a published Sixth Circuit opinion which specifically addresses the question of whether or not binding precedent is required for application of the good faith exception to the exclusionary rule. The Sixth Circuit's unpublished decision in *United States v. Jarrell*, 2003 WL 21500171 (6th Cir. 2003), is enlightening. In that case, the defendant had entered a conditional plea of guilty after his motion to suppress was denied. Defendant had been indicted for manufacturing marijuana. The indictment arose out of information received from a confidential informant. After receiving this information, the agents proceeded with their investigation, which included visiting the location and receiving copies of the electric power usage

records for defendant's residence.  Eventually, the agents utilized a thermal imager to determine

whether or not extreme heat was present.  The imager established that extreme heat was present.

Thereafter, the agents sought a search warrant, which relied in part on the information received by

utilization of the thermal imager.  The use of the thermal imager in the *Jarrell* case preceded the

Supreme Court's decision in *Kyllo*.  The Sixth Circuit explained:

> Jarrell filed a motion to suppress in the district court, arguing, inter
> alia, that the search warrant violated the Fourth Amendment. The
> district court found that because of the Supreme Court's decision in
> *Kyllo v. United States*, the thermal imaging used by Agent Watters,
> without a separate search warrant for the thermal imaging, was a
> Fourth Amendment violation and, therefore, could not be considered
> in determining whether a search warrant should issue. Without the
> thermal imaging, the district court found that "the question of
> probable cause is quite close, but just misses the mark." The court,
> however, applied the good faith exception enunciated in *United States
> v. Leon* and denied Jarrell's motion. Jarrell appeals the court's
> decision. This Court reviews a district court's findings of fact on a
> suppression issue under the clearly erroneous standard, and its
> conclusions of law under a de novo standard.
>
> *   *   *
>
> At the time Agent Watters used the thermal imaging, the issue of
> whether thermal imaging constituted a search under the Fourth
> Amendment had not been decided by the Sixth Circuit, however,
> several other circuits had found that the warrantless use of thermal
> imaging on properties ranging from out buildings to homes was
> constitutional under the Fourth Amendment. Only the Tenth Circuit
> at the time had found that the use of thermal imaging constituted a
> search thus requiring a warrant under the Constitution. Subsequently,
> the Supreme Court in *Kyllo* held that thermal imaging does constitute
> a search and that "it will remain for the District Court to determine
> whether, without the evidence it provided, the search warrant issued
> ... was supported by probable cause- and if not, whether there is any
> other basis for supporting admission of the evidence that the search
> pursuant to the warrant produced." In the case at bar, the district court
> applied Kyllo and decided that without the thermal imaging, probable
> cause did not exist for the warrant, but a basis for supporting the
> admission of the evidence did exist through the *Leon* good faith
> exception.

Jarrell argues that because there was a split in the circuit courts regarding use of thermal imaging at the time the warrant was issued, Agent Watters's reliance on the warrant, which included the thermal imaging, was not made in good faith. The Court disagrees. Aside from the thermal imaging, Agent Watters also relied on the informant's tip, his corroboration of the informant's information, the electrical power usage records, and his knowledge as a police officer with experience in the area of marijuana growing cases. Therefore, even if Agent Watters had not considered the thermal imaging evidence, his actions cannot be categorized as unreasonable. Furthermore, his reliance on the thermal imaging evidence at a time when courts of appeals disagreed on the use of such imaging in the context of the Fourth Amendment cannot be said to be objectively unreasonable.

*Id*. at **2-3.

In *United States v. Buford*, 632 F.3d 264 (6th Cir. 2011), the Sixth Circuit recently addressed application of the good faith exception to the exclusionary rule after the search of a vehicle. In that case, a search of the vehicle had occurred prior to the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009), pursuant to existing Sixth Circuit precedent which had interpreted *Belton* to allow vehicle searches incident to an arrest.

Applying the governing legal principles of these decisions to the facts of the case before us, we join the Fifth, Tenth, and Eleventh Circuits in holding that exclusion is not the appropriate remedy when an officer reasonably relies on a United States Court of Appeals' well-settled precedent prior to a change of that law.[FN9] The fact that appellate precedent is later overturned is not enough to justify suppression, since the "exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges[,]" and there is "no meaningful distinction" between relying on an invalid search warrant issued by a court and relying on settled precedent that, at the time of the search, held such warrantless searches to be lawful.[FN10]

> [FN9.] Like the Eleventh Circuit, we also "stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation."

- 10 -

FN10.   *Gant* itself underscored the reasonableness of an officer's reliance on settled law, even if that law is later overturned. The Court noted that qualified immunity will shield officers from liability in civil suits challenging unconstitutional vehicle searches conducted before *Gant* because such officers acted in "reasonable reliance" on the then-prevailing and "widely accepted" understanding of *Belton*. That observation directly supports the conclusion that the good-faith exception to the exclusionary rule applies in criminal prosecutions because the qualified immunity test turns on the same standard of reasonableness as the good-faith exception.

*Id*. at 276 (citations omitted).

If this Court adopts the position taken by the Sixth Circuit in *Jarrell*, then the good faith exception to the exclusionary rule should be applied in this case. At the time of the installation of the GPS units by UPSET officers in Fisher's and Walker's cases, not a single federal circuit court had concluded that the Fourth Amendment applied to such a situation. In *United States v. Garcia*, the Seventh Circuit held that GPS tracking was not a search under the Fourth Amendment. 474 F.3d 994, 997-98 (7th Cir. 2007). The Eighth and Ninth Circuits issued similar decisions. *See United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010), and *United States v. Pineda-Mareno*, 591 F.3d 1212 (9th Cir. 2010). It was not until August of 2010, when the D.C. Circuit issued its decision in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), that there was a Court of Appeals' opinion finding that use of a GPS unit to track movements on public thoroughfares was a Fourth Amendment search.

There were Sixth Circuit decisions interpreting *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984), that provided support for the actions of law enforcement officers in utilizing a GPS unit in these two cases. In *United States v. Cassity*, 720 F.2d 451 (6th Cir. 1983), law enforcement officers had utilized electronic beepers to track the movements of defendant's vehicle on open highways when highway surveillance was interrupted, and to locate

the vehicle when they had lost track of it.  Judge Martin interpreted *Knotts* as holding that the use
of electronic beepers installed in personal property to monitor activities open to public inspection
did not implicate the Fourth Amendment.  The Court went on to find that beeper surveillance of non-
contraband personal property in private areas was a Fourth Amendment search.[1]  In *United States
v. Forest*, 355 F.3d 942 (6th Cir. 2004), Judge Gilman explained:

> In *United States v. Knotts*, the Supreme Court considered whether the
> police invaded the defendants' legitimate expectation of privacy by
> monitoring the signal emitted from a beeper (a radio transmitter)
> placed in a container of chemicals by the government. The defendants
> had placed the container in a car, and the signal emitted from the
> beeper allowed the police to track the movements of the car along
> public roads. At one point during the tracking, the police lost visual
> contact with the car after the driver "began making evasive
> maneuvers." But the beeper's signal allowed the police to reestablish
> visual contact and eventually locate the container inside a cabin. The
> Supreme Court held that the police had not invaded the defendants'
> legitimate expectation of privacy because "[t]he governmental
> surveillance conducted by means of the beeper in this case amounted
> principally to the following of an automobile on public streets and
> highways. . . . A person travelling in an automobile on public
> thoroughfares has no reasonable expectation of privacy in his
> movements from one place to another."

*Id*. at 950-951 (citations omitted).

In an unpublished opinion in *United States v. Ward*, 1987 WL 44469 (6th Cir. 1987),
the court upheld the decision of the Eastern District of Tennessee that the use of a beeper to track
a car's movements was not a search under the Fourth Amendment.  The Sixth Circuit explained:

> Without exploring in greater detail the skillful and vigorous
> arguments which defendants' counsel have made on their behalf, it is
> sufficient to say that our examination of the record fully confirms the
> correctness of the decision of United States District Judge R. Allan

---

[1]One of the law enforcement officers in the instant case testified that it was his understanding
of the law at the time the beepers were installed that they could monitor defendants' activity on
public streets but could not monitor activity inside private areas such as homes or dwellings.

> Edgar as expressed in his memorandum opinion and order filed in the district court on December 1, 1986. We particularly find that the use of the beeper was not violative of *United States v. Karo*, but is in line with the limitations placed upon such use in *United States v. Knotts*.

*Id*. at *2 (citations omitted).

In both *Karo* and *Knotts*, it was the government who was responsible for the placement of a beeper in personal property the government knew the defendants would acquire. Installation of the beepers was intended to permit government officials the ability to track the movements of defendants in their vehicles.  The Court in *Karo* explained:

> At most, there was a technical trespass on the space occupied by the beeper. The existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, however, for an actual trespass is neither necessary nor sufficient to establish a constitutional violation. Compare *Katz v. United States* (no trespass, but Fourth Amendment violation), with *Oliver v. United States* (trespass, but no Fourth Amendment violation). Of course, if the presence of a beeper in the can constituted a seizure merely because of its occupation of space, it would follow that the presence of any object, regardless of its nature, would violate the Fourth Amendment.
>
> * * *
>
> In *United States v. Knotts*, law enforcement officials, with the consent of the seller, installed a beeper in a 5-gallon can of chloroform and monitored the beeper after delivery of the can to the buyer in Minneapolis, Minn. Although there was partial visual surveillance as the automobile containing the can moved along the public highways, the beeper enabled the officers to locate the can in the area of a cabin near Shell Lake, Wis., and it was this information that provided the basis for the issuance of a search warrant. As the case came to us, the installation of the beeper was not challenged; only the monitoring was at issue. The Court held that since the movements of the automobile and the arrival of the can containing the beeper in the area of the cabin could have been observed by the naked eye, no Fourth Amendment violation was committed by monitoring the beeper during the trip to the cabin. In Knotts, the record did not show that the beeper was monitored while the can containing it was inside the cabin, and we therefore had no occasion to consider whether a

constitutional violation would have occurred had the fact been otherwise.

468 U.S. at 712-714 (citations omitted).

Justice Scalia's opinion in *United States v. Jones*, 132 S.Ct. 945 (2012), clearly establishes that these interpretations of *Knotts* and *Karo* are no longer accurate. According to Justice Scalia, in both those cases beepers were placed in a container before defendants were in possession of the containers and, therefore, no trespass had occurred. In *Jones*, because law enforcement officers had directly placed the GPS unit on defendant's vehicle, the trespass has occurred.[2]

The *Jones* decision represents a significant change in Fourth Amendment jurisprudence unanticipated by any of the circuit courts which had faced the question of whether use of a GPS unit amounted to a Fourth Amendment search. Courts and commentators had understood that in *Katz v. United States*, 389 U.S. 347 (1967), "the Supreme Court replaced the trespass doctrine with the privacy doctrine." JOEL SAMAHA, CRIMINAL PROCEDURE 54 (8th ed. 2011). The quote from Justice White's opinion in *United States v. Karo* supports the conclusion that the trespass doctrine has been abandoned in *Katz*. Recently, in analyzing Fourth Amendment jurisprudence, one commentator explained:

> Unlike previous Fourth Amendment cases which relied upon a trespass or other physical intrusion in finding a constitutional violation, the installation of the listening and recording device on top of – but without penetrating – the telephone booth was given little

___

[2]Justice Scalia's opinion appears to allow the secondhand placement of GPS units on vehicles, but not the firsthand placement. Nanotechnology will undoubtedly result in smaller and smaller GPS units, cameras and surveillance devises. According to Justice Scalia's opinion, it would be permissible to implant one of these in a prescription bottle to be picked up by a defendant as long as it was placed in the prescription bottle before the defendant picked it up. Having picked it up, the government would be entitled to monitor the defendant's movements. Agents seeking to conduct long term electronic surveillance of a vehicle could find out where the suspect has his/her oil changed and install the GPS unit on the filter before it is sold to the suspect.

consideration by the Court.  The Court made this point emphatically, overruling their decisions in *Olmstead* and *Goldman* which relied upon a physical penetration or some physical trespass.  The Court "conclude[d] that the underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling." The *Katz* Court found a Fourth Amendment search even though it was conducted in a public area, and without an accompanying trespass. Because "the Fourth Amendment protects people, not places," the Court centered its Fourth Amendment analysis on the subjective (individual) and objective (societal) expectations of privacy. Accordingly, after *Katz*, Fourth Amendment protection could be found to exist regardless of whether the search was accomplished by a physical intrusion and regardless of whether the area was considered "constitutionally protected." It was generally thought, at least before [the] Court's decision in *Jones*, that *Katz* displaced the notion that the Fourth Amendment attaches only to protected places, and instead refocused the Fourth Amendment on people and expectations of privacy.  While there remained some disagreement regarding the extent to which trespass and property concepts played a role in *Katz's* reasonable-expectation-of-privacy test, there was little disagreement that Fourth Amendment analysis no longer required proof of a physical trespass or reliance upon common law property concepts.

\* \* \*

In reaching this conclusion, Justice Scalia reasserts that *Katz* was never intended to displace the role of trespass or property law in Fourth Amendment analysis. Instead, Scalia posits, *Katz* merely provided an alternative calculus for analyzing potential Fourth Amendment violations in the absence of a trespass. Justice Scalia observes:

> As Justice Brennan explained in his concurrence in *Knotts*, *Katz* did not erode the principle "that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." We have embodied that preservation of past rights in our very definition of "reasonable expectation of privacy" which we have said to be an expectation "that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to

understandings that are recognized and permitted by society." *Katz* did not narrow the Fourth Amendment's scope.

Scalia is correct in the proposition that consideration of property concepts remains relevant, and he cites, for example, Justice Rehnquist's majority opinion in *Rakas*. Justice Scalia and Justice Sotomayor both rely upon this language in their opinions in *Jones*: "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

But while citing this excerpt from *Rakas*, Justice Scalia fails to acknowledge that the *Rakas* Court was explaining the dual prongs of the *Katz* legitimate-expectation-of-privacy test. The full quote provides the proper context and, once again, undercuts the fundamental proposition of Justice Scalia's opinion in *Jones*:

> [A] "legitimate" expectation of privacy by definition means more than a subjective [expectation] of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence, in the words of *Jones*, is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.'" And it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest. These ideas were

- 16 -

rejected both in *Jones* and *Katz*. But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment.

As *Katz* held, and *Rakas* reaffirmed, in assessing whether the expectation is reasonable, one must look beyond the text of the Fourth Amendment to sources that help inform our understandings of what society has traditionally accepted as an objectively reasonable expectation of privacy. This is a steadfast position from which the Court has not strayed for the last fifty years. But it is a far cry indeed from Justice Scalia's contention that trespass or other property concepts should apply as a stand-alone test.

However, Justice Scalia's treatment of *Katz* and its reasonable-expectation-of-privacy formula should come as no surprise to those who closely follow his opinions in this area. Justice Scalia has, on multiple occasions, assailed the *Katz* formula as, among other things, "circular," "fuzzy," "self-indulgent," and "notoriously unhelpful." It may well be that the opinion in *Jones* represents a first step in formalizing an approach that Justice Scalia has advanced in his opinions for more than twenty years: "In my view, the path out of this confusion [of Fourth Amendment jurisprudence] should be sought by returning to the first principle that the 'reasonableness' requirement of the Fourth Amendment affords the protection that the common law afforded."

Kevin Emas & Tamara Pallas, *United States v. Jones: Does Katz Still Have Nine Lives*, 24 Sᴛ. Tʜᴏᴍᴀꜱ L. Rᴇv. 116, Spring 2012.

Prior to the *Jones* decision, all but one of the circuit courts that had looked at the issue concluded that the use of a GPS unit to monitor the location of a vehicle on public roadways was not a Fourth Amendment search. Sixth Circuit jurisprudence established that the use of electronic means of surveillance, a beeper to monitor a vehicle's location on public roadways, did not amount to a Fourth Amendment search.

It was, in the opinion of the undersigned, objectively reasonable for law enforcement officers to believe, at least prior to *Maynard*, that the Fourth Amendment was not implicated by the

placement of a GPS unit on a vehicle to monitor its location on public roadways.  Admittedly, there was not binding precedent in the Sixth Circuit addressing the question of whether the placement of a GPS unit on a vehicle amounted to a Fourth Amendment search.  According to defendants, this commands a decision that the good faith exception to the exclusionary rule cannot be applied in these cases.  *See United States v. Lee*, 2012 WL 1880621 (E.D. Ky. 2012).

The Fourth Amendment requires a careful balance between competing interests.  On the one hand, society wants law enforcement officers to protect it from criminals and provide a safe living environment.   On the other hand, the Fourth Amendment protects individuals from unreasonable interference by the government.  These two competing interests must be balanced:

> Madison concluded that it would be necessary to "so contriv[e] the interior structure of the government as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places."  The goal, expressed in possibly the most famous passage in *The Federalist Papers*, was to
>
>> giv[e] to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others. The provision for defense must in this, as in all other cases, be made commensurate to the danger of attack. Ambition must be made to counteract ambition. The interest of the man must be connected with the constitutional rights of the place. It may be a reflection on human nature, that such devices should be necessary to control the abuses of government. But what is government itself, but the greatest of all reflections on human nature? If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.

Steven G. Calabresi & Gary Lawson, *Symposium: The Legacy of the Federalist Papers, the Eleventh Annual National Federalist Society Symposium on Law and Public Policy - 1992*, 16 HARV. J.L. & PUB. POL'Y, Vol. 16, No. 1, Winter 1993, citing THE FEDERALIST NO. 51, at 321-22 (James Madison)(Clinton Rossiter ed., 1961).

In 1923, in the case of *United States v. Garsson*, 291 F. 646 (1923), Judge Learned Hand explained:

> Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime.

*Id*. at 649.

On the other hand, "experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. . . .  The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."  *Olmstead v. United States*, 277 U.S. 438, 479 (1928).

When the efforts of law enforcement officers are objectively reasonable in light of the existing precedent at the time that action is taken, law enforcement officers, and more importantly the public, should not be penalized and relevant evidence should not be denied its way into the courtroom because a later decision of the Supreme Court establishes that the Fourth Amendment was violated.  When law enforcement officers fail to obtain a warrant, when currently existing precedent establishes that it is required, their actions cannot be tolerated.  If, however, law enforcement officers act in an objectively reasonable manner in failing to obtain a warrant, law enforcement officers, the public, and the judicial system should not be required to ignore relevant evidence.

Requiring police officers to rely on binding circuit court precedent to determine whether or not a warrant is required is unrealistic. Technology is ever changing. Nanotechnology is undoubtedly going to change tools available to law enforcement officers. As the testimony in the instant cases indicated, GPS tracking technology had been utilized by the Michigan State Police for several years prior to its use in these cases. The Sixth Circuit had not addressed GPS technology prior to the Supreme Court's decision in *Jones*. It was objectively reasonable, however, for the law enforcement officers to believe that their conduct complied with the Fourth Amendment. GPS technology and beeper technology are not identical, but the beeper cases provided guidance to law enforcement officers. Accepting the proposition that there must be binding precedent for *Leon* to apply, each time technology changes law enforcement officers would be required to seek warrants. Such an approach is unrealistic and would significantly hamper law enforcement officers. If law enforcement officers have acted consistently with decisions by other Courts of Appeals throughout the United States, the good faith doctrine should be applied. We should not hold our law enforcement officers to a higher standard, to a greater understanding of the law, than is possessed by the Courts of Appeals throughout the country. A standard based on objective reasonableness may be more difficult to apply than one based on binding precedent; however, considering the competing interests at work, an objective reasonable test is superior.

Following *Jones*, the district court in *United States v. Robinson*, 2012 WL 4893643 (E.D. Mo. 2012), held that surveillance by a GPS unit did not require a warrant and that law enforcement officers must have a reasonable suspicion, not probable cause, to justify the search. There is no binding precedent from that circuit addressing these issues. Law enforcement officers should not be required to go to that district court for a search warrant. Such a request, to that court, would not be met with enthusiasm. If the circuit court later reverses the district court's decision in

*Robinson*, law enforcement officers who relied on that decision, in that district, should not be penalized. Requiring binding precedent from the circuit court will not necessarily promote the purpose for which the exclusionary rule was created and could significantly impact law enforcement in a negative way.

Accordingly, it is respectfully recommended that the Court apply the good faith exception to the exclusionary rule in these two cases and deny defendants' motions to suppress. If, however, the Court disagrees with this recommendation and concludes that the good faith exception to the exclusionary rule is not applicable in this case, defendants are not automatically entitled to a granting of their motions to suppress.

Following *Jones*, it is clear that the installation of the GPS units on defendants' vehicles constitutes a Fourth Amendment search. *Jones* does not answer the question of whether or not law enforcement officers were required to obtain a warrant before placing the GPS units on the vehicles. In addition, it is less than clear whether installation of a GPS unit must be supported by reasonable suspicion or probable cause. If a warrant is required for installation of a GPS unit, the question presented in these cases is easily resolved as no warrants were obtained. All evidence derived and the fruits of evidence derived from the installation of the GPS units must be excluded.

Following *Jones*, at least one court has concluded that a warrant is not required for installation of a GPS unit. *See United States v. Robinson*, 2012 WL 4893643 (E.D. Mo. 2012). That court held that the applicable standard was reasonable suspicion and that no warrant was required. The Supreme Court in *Jones* did not address the question of whether or not a warrant was required and whether or not the search must be supported by reasonable suspicion or probable cause:

> The Government argues in the alternative that even if the attachment and use of the device was a search, it was reasonable – and thus lawful – under the Fourth Amendment because "officers had

> reasonable suspicion, and indeed probable cause, to believe that
> [Jones] was a leader in a large-scale cocaine distribution conspiracy."
> We have no occasion to consider this argument. The Government did
> not raise it below, and the D.C. Circuit therefore did not address it..
> We consider the argument forfeited.

132 S.Ct. at 954 (citations omitted). The Sixth Circuit has not addressed this question either. This

Court is thus left to guess what the Sixth Circuit and Supreme Court would do when faced with the

question.[3]

In my opinion, following *Jones*, law enforcement officers must obtain a warrant to

support use of GPS technology to perform long term surveillance of a suspect. I recommend that

the Court find that absent exigent circumstances, law enforcement officers be required to obtain a

warrant prior to installation of a GPS unit. If exigent circumstances exist, that would, in my opinion,

justify placement of a GPS unit on a vehicle without first obtaining a warrant. Where, however, the

surveillance is long term, law enforcement officers should be required to obtain a warrant after

installation of the GPS unit. Application of the vehicle exception to the warrant requirement is not,

in my opinion, justified under the circumstances. In *Carroll v. United States*, 267 U.S. 132 (1925),

a warrantless search of an automobile based on probable cause was upheld because "it is not

practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or

jurisdiction in which the warrant must be sought." *Id.* at 153. *See also United States v. Galaviz*, 645

F.3d 347 (6th Cir. 2011); *California v. Carney*, 471 U.S. 386 (1985). Admittedly, some courts have

held that there is a reduced expectation of privacy in vehicles and, therefore, warrants are not

required to search them when probable cause exists. I believe the long term nature of GPS

---

[3]A difficult task, indeed. Even if this Court correctly predicts what the Sixth Circuit would do when faced with the question, there is no guarantee that the Supreme Court would agree.

surveillance and the court's opinion in *Jones* supports the requirement that law enforcement officers secure a warrant.

My reading of *Jones* leads me to conclude that to justify the long term use of a GPS unit to conduct surveillance on an individual, law enforcement officers must have probable cause to believe that the individual is engaged in criminal activity and that installation of a GPS unit will assist in their investigation of that criminal activity. The reasonable suspicion standard requires a lesser quantity or quality of articulated facts to support a Fourth Amendment intrusion. The reasonable suspicion standard is more appropriate for short term invasions of a Fourth Amendment interest, such as a stop or frisk. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Adams v. Williams*, 407 U.S. 143 (1972).

I have reviewed the materials filed in these matters, as well as the testimony offered at the suppression hearings held on December 17, 2010, and the hearings held since the matter was remanded. In my opinion, based on the totality of the circumstances, probable cause existed to justify installation of a GPS unit on Ashley Walker's vehicle. This is based on the controlled buys and the corroborated information received from a confidential informant. *See United States v. Dyer*, 580 F.3d 386 (6th Cir. 2009), where the court found that corroborated information from a confidential source could establish probable cause. On the other hand, at the time of the installation of the GPS unit on Brian Fisher's vehicle in May 2010, probable cause did not exist to justify placement of the GPS unit. A review of the evidence of record establishes that at the time of the installation of the GPS unit on Fisher's vehicle, police officers had a reasonable suspicion justifying installation of a GPS unit, but not probable cause. Accordingly, if the Court holds that no warrant was required for installation of the GPS units, but probable cause was required, then the information learned from the GPS units would be admissible in Ashley Walker's case and inadmissible in Brian

Fisher's case.  If the Court holds that no warrant was required for installation of the GPS units, and "reasonable suspicion" is the governing standard, then neither motion to suppress should be granted.

The next question is what evidence should be excluded if the Court grants one or both motions to suppress.  All GPS derived evidence should be excluded if the Court concludes that a warrant was required to install the GPS units, as no warrants were obtained.  However, my review of the evidence establishes that, at the time the arrests of Walker and Fisher were made,[4] law enforcement officers had probable cause to believe that both defendants engaged in distribution of controlled substances.  In both cases, law enforcement officers used physical surveillance, as well as surveillance by use of the GPS units.  In both cases, law enforcement officers had confidential information which they had corroborated.  Absent the information learned from the GPS units, law enforcement officers had a sufficient basis to justify the arrests of defendants and the search of their vehicles.  Defendants both argue that their arrests and the search of their vehicles are fruits of the poisonous tree of the unlawful installation of the GPS units.  However, a review of the totality of the circumstances, when excluding the GPS information, provides a sufficient basis to justify the arrests of defendants and the search of their vehicles.

## Conclusion

It is respectfully recommended that the Court apply the *Leon* good faith doctrine to deny defendants' motions to suppress.  Alternatively, if the Court concludes that the good faith doctrine is inapplicable and a warrant was required, it is recommended that defendants' motions to suppress be granted, in part. If the Court concludes that no warrant was required, but probable cause was necessary, then defendant Fisher's motion to suppress should be granted.  If the Court concludes

---

[4]By the time of defendant Fisher's arrest, the totality of circumstances known by the arresting officers, absent the GPS information, established probable cause.

that no warrant was required, but reasonable suspicion was necessary, neither motion to suppress should be granted.  If one or both motions to suppress are granted, it is recommended that only the specific information gained from use of the GPS unit(s) should be excluded, not the evidence obtained following the arrest of defendants, including the evidence found following the search of defendants' vehicles.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within twenty-eight (28) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b); W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  December 12, 2012